IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

PATRICIA D. PRATT                                                    PLAINTIFF

            v.                        Civil No. 08-3007

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                       DEFENDANT

## MEMORANDUM OPINION

        Plaintiff, Patricia Pratt, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying her claims for a period of disability, disability insurance benefits ("DIB"), and

supplemental security income ("SSI") pursuant to Titles II and XIV of the Social Security Act

(hereinafter "the Act"), 42 U.S.C. §§ 416(i) and 423.  In this judicial review, the court must

determine whether there is substantial evidence in the administrative record to support the

Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## Procedural Background

        The plaintiff filed her applications for DIB and SSI on February 19, 2004, alleging an

inability to work since May 28, 2000, due to arthritis, fibromyalgia, and depression.  (Tr. 15, 61-

63, 80-81, 353-356, 370-374).  An administrative hearing was held on October 10, 2006.  (Tr.

368-417).  Plaintiff was present and represented by counsel.

        At the time of the administrative hearing, plaintiff was 32 years old and possessed the

equivalent of a high school education.  (Tr. 15, 331-332).  The record reveals that she had past

relevant work experience ("PRW") as a cashier.  (Tr. 81-82, 87-94, 371).

On April 17, 2007, the Administrative Law Judge ("ALJ") determined that plaintiff suffered from a combination of severe impairments, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 27). He then concluded that plaintiff maintained the residual functional capacity ("RFC") to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull within those same limitations, sit for 6 hours in an 8-hour work day with normal breaks, and stand and/or walk for 2 hours in an 8 hour workday with normal breaks. He also limited plaintiff to walking continuously for one-half of a city block before resting; using her right hand 45% of the time to grasp, turn, and twist objects; using her left hand 35% of the time to grasp, turn, and twist objects; using her fingers 50% of the time for fine manipulation; using her arms for reaching and overhead reaching 45% of the time; occasionally pulling/pulling and operating controls with her hands and feet; and, occasionally climbing, balancing, stooping, kneeling, crouching, crawling, bending, and twisting at the waist. (Tr. 27-28). Further, the ALJ indicated that she should avoid moderate exposure to heights, moving machinery, chemicals, humidity, dust/fumes, temperature extremes, and vibrations, as well as avoid concentrated exposure to noise. (Tr. 28). From a mental standpoint, he found plaintiff had a good ability to follow work rules, interact with supervisors, understand, remember, and carry out detailed but not complex job instructions, maintain personal appearance, and, behave in an emotionally stable manner; a fair ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, and understand, remember, and carry out complex job instructions; and, an unlimited ability to understand, remember, and carry out simple job instructions. With the assistance of a vocational expert, the ALJ determined that

AO72A
(Rev. 8/82)

plaintiff could perform work as a surveillance system monitor, call out operator, and order clerk. (Tr. 28, 126-130).

The plaintiff appealed this decision to the Appeals Council, but her request for review was denied on December 27, 2007.   (Tr. 4-6).  Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Doc. # 6, 7).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v.*

AO72A
(Rev. 8/82)

*Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A),

1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3),

1382(3)(c).  A plaintiff must show that her disability, not simply her impairment, has lasted for

at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation

process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial

gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or

mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal

an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

relevant work; and, (5) whether the claimant is able to perform other work in the national

economy given her age, education, and experience.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Only

if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

experience in light of her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138,

1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Evidence Presented:**

Records indicate that plaintiff had been shot with a pellet gun during childhood.  The

bullet remained lodged in her right upper abdomen, over her kidney.  (Tr. 310).

On May 7, 2000, plaintiff complained of a headache and neck and back pain.  (Tr. 293).

She reported episodic muscle spasms and a constant low level ache.  An examination revealed

a good range of motion in the neck with no palpable tenderness of the cervical musculature; a

4

decreased range of motion in the back with some lumbar discomfort paraspinally; and, a normal neurological exam.  The doctor assessed her with lower back and neck pain and prescribed Arthrotec and Soma.  (Tr. 293).

On August 26, 2002, plaintiff reported swelling in her hands and fingers.  (Tr. 200).  She had stiffness with a decreased range of motion by report, but no obvious arthritis or synovitis was present.  Dr. De Young diagnosed her with arthritis of the hands and ordered blood work.  He also prescribed Motrin.  (Tr. 200).

On January 15, 2003, plaintiff underwent an echocardiogram.  (Tr. 255-256).  It revealed normal left ventricle function with normal left ventricle size, an ejection fraction rate of 50-55%, no segmental wall motion abnormalities, and no evidence of valvular disease.  (Tr. 255-256).

On March 31, 2003, plaintiff sought treatment for arthritis of the hands, especially the fifth digit of her right hand.  (Tr. 198).  Dr. Bruce DeYoung noted that records showed she had been treated for arthritis of the right knee and placed on Celebrex.  Although it had generally helped the arthritis, plaintiff continued to report considerable hand pain by mid-afternoon.  An examination revealed a full range of motion in all digits with no frank swelling or redness.  No crepitus was noticed in the joints.  Dr. DeYoung diagnosed her with osteoarthritis and hand pain and increased her Celebrex dosage.  (Tr. 198).

On May 8, 2003, plaintiff reported continued problems with cervical myalgias, particularly at night.  (Tr. 197).  She had a decreased range of motion in her cervical spine with rotation and movement.  However, plaintiff continued to have full strength against resistance of the examiner's hand.  Tenderness in the post occipital and lateral neck muscles was also noted.

5

The doctor diagnosed plaintiff with acute cervical strain and prescribed physical therapy, Flexeril, Lortab, and a cervical pillow. (Tr. 197).

On June 26, 2003, plaintiff was treated for a direct blow to her right ankle. (Tr. 247-252). X-rays were negative and plaintiff was prescribed an air splint and Motrin. (Tr. 247-252).

On March 5, 2004, plaintiff sought treatment for right ankle pain. (Tr. 232-240). She was reportedly playing basketball when she twisted her ankle. She reported numbness over the ankle and pain across the top of her foot. X-rays revealed no acute fracture or dislocation with good alignment of the metatarsals and phalanges. Some secondary ossification adjacent to the cuboid was also noted. The doctor prescribed an ACE wrap, elevation, ice, crutches, Vicodin, and Ibuprofen. (Tr. 232-240).

On March 15, 2004, plaintiff was assessed for complaints of diffuse myalgia, arthralgia, fatigue, and nonrestorative sleep. (Tr. 216-231, 334-343). Dr. Safwan Sakr, a rheumatologist assessed her with fibromyalgia syndrome/chronic fatigue syndrome and prescribed Flexeril. He also ordered lab work. Dr. Sakr noted that his examination revealed no synovitis or synovial thickness, no swollen or tender joints, and a normal range of motion in all joints. (Tr. 216-231).

On April 30, 2004, plaintiff complained of lower back pain. (Tr. 194). She was treated in the ER a few days earlier after lifting some masonry cement blocks. Plaintiff reported feeling a pop when she twisted. She indicated that the Ultracet had not helped. Tenderness over the paraspinous muscles in the thoracic and lumbar regions was noted. X-rays of her thoracic and lumbar spine were reviewed and the disc spaces were noted to be even throughout. Some early arthritis was noted in the thoracic region. The doctor diagnosed plaintiff with back strain and prescribed Darvocet and Flexeril. (Tr. 194).

6

On May 5, 2004, plaintiff complained of worsening lower back pain. (Tr. 194). She described it as sharp, constant pain that felt like needles pricking her. Plaintiff even indicated that she had been up at night crying due to the pain. The doctor noted that she had completed her Prednisone taper and her Flexeril without improvement. The doctor noted tenderness over the paraspinous muscles in the lumbar region. He diagnosed her with lower back pain and prescribed Norco. He also ordered an MRI of her lumbar spine. (Tr. 194).

On May 10, 2004, plaintiff reported left thumb pain and right foot pain after dropping a board on her foot. (Tr. 192). An examination noted a bruise to the top of her right foot and thumb tenderness to the touch. (Tr. 192).

On May 11, 2004, progress notes indicate that plaintiff had no synovitis, swollen joints, or joint tenderness, and exhibited a normal range of motion in all joints. (Tr. 207). It was recommended that she continue aquatic pool therapy and Flexeril. (Tr. 207).

An MRI of plaintiff's lumbar spine dated May 13, 2005, was essentially unremarkable. (Tr. 333). Very minimal disk bulging was noted at the L5-S1 level. (Tr. 333).

On May 14, 2004, progress notes reveal that plaintiff was suffering from depression and anxiety. (Tr. 191). She reported sharp chest pains with lightheadedness and shortness of breath. Plaintiff indicated that she had been under more stress than usual, and also reported difficulty sleeping, overwhelming feelings of guilt, a lower energy level, trouble concentrating, and a decreased appetite. She denied suicidal ideation, but did state that she was a worrier. The doctor prescribed Effexor-XR. (Tr. 191).

On May 26, 2004, plaintiff complained of left forearm pain after hitting her arm on a door. (Tr. 190). She also reported weakness due to the pain. The left forearm was noted to be

7

tender on the radial side, with no deformities.  X-rays revealed no fracture or periosteal lifting.

Plaintiff was diagnosed with left forearm pain, likely a bone bruise, and prescribed NSAIDS and

Vioxx.  (Tr. 190).

On June 15, 2004, plaintiff reported continued complaints of arthralgias in her thoracic

spine, hands, and knees, stating that Celebrex was not working.  (Tr. 185).  Recent x-rays of her

lumbar spine and wrist had shown no degenerative process.  The doctor noted her diagnosis of

fibromyalgia.  A physical exam showed tenderness in the anterior chest wall, mid and lower

thoracic spine, SI junctions bilaterally, and knees.  Plaintiff was diagnosed with arthralgias and

prescribed a trial of Skelaxin and Mobic.  The Celebrex was discontinued.  The doctor also

ordered x-rays of plaintiff's hand and thoracic spine and prescribed Trazodone to help her sleep.

(Tr. 185).

On June 15, 2004, x-rays of her thoracic spine revealed very minimal degenerative bony

spurring with good disc preservation.  (Tr. 331).  The lumbar spine was unremarkable.  (Tr. 332).

On June 18, 2004, plaintiff's condition had improved on Mobic.  (Tr. 184).  She sought

a letter from her doctor indicating that she was suffering from osteoarthritis, but he refused.

Although she said Dr. DeYoung had diagnosed her with osteoarthritis in the upper back, knees,

and hands, this was not confirmed by x-rays.  (Tr. 184).

On July 1, 2004, plaintiff complained of knee pain.  (Tr. 183).  Records indicate she had

hit her patellar area approximately two days prior and was experiencing pain with weight-bearing

activity.  An exam of her left lower extremity revealed a small effusion of the left knee, with no

patellar instability.  The doctor assessed her with a contusion to her left knee, wrapped it in an

Ace bandage, directed her to apply ice, and prescribed Mobic.  (Tr. 183).

8

On September 21, 2004, Dr. Sakr noted no synovitis, swollen or tender joints, and a full range of motion. (Tr. 203). He prescribed Mobic and aquatic pool therapy for her fibromyalgia. (Tr. 203).

On October 22, 2004, plaintiff underwent a physical therapy evaluation with physical therapist Renee Barnes. (Tr. 204-205, 329-330). Plaintiff rated her pain as a 9 on a 10 point scale in both her lower extremities, lumbar and thoracic spine, cervical spine, both hands and wrists, and both shoulders. She was reportedly taking Mobic and Skelaxin, as well as Trazodone for sleeping at night. Her range of motion was noted to be within normal limits for her age with functional strength and normal tone. Ms. Barnes felt plaintiff would benefit from initiating aquatic therapy to possibly enhance her sleep cycle as well as decrease her pain. (Tr. 204-205).

On November 29, 2004, Renee Barnes, a physical therapist, wrote a letter to Dr. Sakr indicating that plaintiff had been discharged from therapy due to 3 no show appointments and cancellations. (Tr. 202, 328).

On November 30, 2004, plaintiff presented with pain in the mid-upper thoracic area, stating that she strained her back the previous Sunday while moving furniture. (Tr. 181). She reported pain with rotation and lateral movement. An examination revealed prominent muscle spasm in the left paraspinous muscles with flexion and rotation and a full range of motion. The doctor diagnosed her with muscular strain with spasm, and prescribed Flexeril, Indocin, and warm compresses. (Tr. 181).

On January 31, 2005, the doctor noted that plaintiff did not complete her aquatic pool therapy. (Tr. 323). She stated that she was not sleeping well on Flexeril. Plaintiff was also experiencing some side effects from the Mobic. The doctor diagnosed her with fibromyalgia,

9

noncompliance, and generalized anxiety disorder.  He then prescribed Klonopin, an increased dosage of Flexeril, and Ultracet to replace the Mobic.  (Tr. 323).

On April 28, 2005, Andy Tiner, a physical therapist indicated that plaintiff was discharged from physical therapy due to noncompliance.  (Tr. 327).  He indicated that plaintiff attended one session and missed or cancelled three.  While she was attending therapy, no swelling, tenderness, or range of motion limitations was noted.  (Tr. 324-326).

On June 7, 2005, plaintiff was reportedly sleeping well, but was still experiencing fatigue and depression.  (Tr. 321).  The doctor noted no swollen or tender joints and a full range of motion in all areas.  He then diagnosed plaintiff with fibromyalgia and prescribed Cymbalta.  (Tr. 321).

On June 10, 2005, plaintiff underwent a neuropsychological evaluation.  (Tr. 263-266). She presented with a history of worsening neurocognitive and emotive symptoms such as impaired recall memory, impaired attention to sequential detail, impaired concentration, word finding difficulty, fatigue, irritability, affective lability, and dysexecutivism.  Plaintiff reported a history fibromyalgia, osteoarthritis, hypertension, degenerative disc disease, and gastroesophageal reflux disease.  She also stated that she was pushed off of a bridge when she was 7 years old, causing her to strike her head on the concrete, resulting in a Grade III concussion.  Dr. Vann Smith noted that plaintiff's recall memory was moderately impaired, her affect muted but flexible, her mood mildly anxious, her judgment and insight intact, her narratives fluent and informative without evidence of associational anomaly, and her thought processes functional.  She also had a full scale IQ of 87.  Dr. Smith diagnosed her with organic

10

brain dysfunction and cognitive dysfunction, and assessed her with a global assessment of functioning ("GAF") score of 60-65.  (Tr. 263-266).

Dr. Smith also completed a mental RFC assessment.  (Tr. 267-271).  He reiterated his diagnoses and indicated that plaintiff's prognosis was fair.  Dr. Smith then opined that plaintiff would be unable to meet competitive standards with regard to maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and, dealing with the stress of semiskilled and skilled work.  He also found plaintiff's ability to sustain an ordinary routine without supervision; work in coordination with or proximity to others without being unduly distracted; deal with normal work stresses; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and, use public transportation to be limited but satisfactory.  (Tr. 267-271).

On June 21, 2005, Dr. Sakr completed a fibromyalgia residual functional questionnaire.  (Tr. 273-277).  He indicated that he had been treating plaintiff since March 2004, and noted that her lab tests had failed to reveal the cause for plaintiff's symptoms.  Dr. Sakr noted 8 out of 18 possible tender points, but no swollen or tender joints.  He noted that plaintiff would need a job that permitted shifting positions at will; would need to lie down at unpredictable intervals; and, would experience significant limitations in reaching, handling, or fingering.  Dr. Sakr also stated

11

that emotional factors contributed to the severity of plaintiff's symptoms and functional limitations; and, her physical impairments plus any emotional impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation.  He then reported that plaintiff could occasionally lift up to 20 pounds, could use her right hand 45% of the time and her left hand 35% of the time, could use the fingers on both hands 50% of the time, and could use both arms for overhead reaching 45% of the time.  Dr. Sakr also found that plaintiff's pain would often be sufficiently severe to interfere with her attention and concentration and that her ability to deal with work stress would be moderately limited.  He then opined that she could walk ½ city blocks without rest or severe pain; sit, stand, and walk less than 2 hours during an 8-hour workday; would need to include periods of walking during an 8-hour workday; could occasionally bend and twist at the waist; and, would likely miss work about once per month due to her impairments and treatment.  Dr. Sakr indicated that plaintiff suffered from fatigue, headaches, anxiety, migraines, weakness, and sleep deprivation.  (Tr. 273-277).

On October 27, 2005, plaintiff reported diffuse body aches and fatigue.  (Tr. 320).  She indicated that she had not tolerated Cymbalta well.  No swelling or tenderness was noted.  The doctor diagnosed her with fibromyalgia and prescribed Lexapro and Lyrica.  (Tr. 320).

On February 21, 2006, plaintiff was reportedly sleeping better with improved mood on Lexapro.  (Tr 318).  However, she did not completed her aquatic pool therapy.  The doctor diagnosed her with FMS and GAD and prescribed Flexeril, Lexapro, and Klonopin.  (Tr. 318).

On February 27, 2006, plaintiff underwent a psychological evaluation with Dr. Robert Hudson.  (Tr. 278-287).  Dr. Hudson diagnosed plaintiff with disruptive behavior disorder, depressive disorder secondary to fibromyalgia, and personality disorder.  The objective data

12

showed her to be of average intelligence with reading ability possibly better than expected.  Dr. Hudson opined that her primary mental diagnosis was possible mixed (cluster c) personality disorder with the depressed overlay based upon her early years, as well as her reaction to her inability to continue with a normal life because of a great deal of pain and the difficulty of rearing two special needs sons.  All in all, he concluded that she had done a better job of coping with her situation than many people would which maybe the result of the toughness of her life. Although she saw her disability primarily in terms of her physical impairments, Dr. Hudson noted that her personality disorder and depression were serious enough to be taken into account as a contributing factor.

Dr. Hudson then completed a mental RFC assessment.  (Tr. 286-287).  He concluded that she had a poor ability to deal with work stress, function independently, and demonstrate reliability.  Dr. Hudson also noted that her ability to relate to co-workers, deal with the public, use judgment, and relate predictably in social situations was fair.  Further, he found her ability to; understand, remember, and carry out complex job instructions was fair to poor, and her ability to behave in an emotionally stable manner was good to fair to poor, depending on the day.  Dr. Hudson stated that plaintiff overestimated her ability and knowledge.  While she could function independently in a situation suitable for her level of training, she would have a tendency to not ask for help.  He indicated that, due to plaintiff's personality dynamics and difficult family, it would be hard to "tease out" how much behavioral variance should be applied to the primary causitive factors.  (Tr. 286-287).

On April 5, 2006, plaintiff underwent an orthopaedic exam with Dr. Ted Honghiran.  (Tr. 288-291).  She was able to walk normally and walk on her tiptoes and heels with no problems.

13

Plaintiff had a complete range of motion, with a limited range of flexion and lateral flexion in her lumbar spine and a limited range of flexion in her cervical spine. No acute muscle spasms were noted and her reflex sensation was intact. The examination of both hands showed no obvious deformity, no chronic joint swelling, and fairly good grip strength. Dr. Honghiran stated that plaintiff's history of chronic joint pain and lower back pain had been diagnosed to be fibromyalgia in nature. He was of the opinion that plaintiff was able to do some type of work, and had a fair prognosis. Dr. Honghiran concluded that plaintiff could frequently lift up to 20 pounds, sit for 6 hours during an 8-hour workday; stand for 2 hours during an 8-hour workday; and, occasionally push/pull/operate controls, reach, climb, balance, stoop, crouch, kneel, and crawl. He also indicated that plaintiff should avoid moderate exposure to heights, moving machinery, chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations. (Tr. 288-291).

On May 30, 2006, plaintiff reported being switched from Klonopin to Paxil. (Tr. 316). She was diagnosed with fibromyalgia and generalized anxiety disorder. (Tr. 316).

On April 24, 2007, James Roberts, the Assistant Administrator of the Baxter County Alternative School indicated that plaintiff's son was a student at his school. (Tr. 361). He stated that the parents were required to provide transportation for the children to and from school each day, as transportation to and from the Mountain Home area was not provided by the school. (Tr. 361).

On April 30, 2007, Beth Kennedy, a outpatient therapist with Hensley Behavioral Health Center, indicated that plaintiff had been bringing her children to therapy at the clinic since

14

September 2005. (Tr. 362). She noted that plaintiff had been "active in family therapy throughout." (Tr. 362).

**Discussion**:

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

We note that the record does indicate that plaintiff complained of arthralgias and has been diagnosed with fibromyalgia and arthritis. However, records also indicate that many of plaintiff's reports of pain were due to injuries she sustained while moving furniture, playing

15

basketball, moving masonry blocks and paint cans, and dropping a board on her foot. X-rays of plaintiff's thoracic spine have revealed very minimal degenerative bony spurring with good disc preservation, while x-rays of her lumbar spine were unremarkable. (Tr. 331-332). An MRI of her lumbar spine was also essentially unremarkable, revealing very minimal disk bulging at the L5-S1 level. (Tr. 333). Aside from acute injuries and isolated instances, physical examinations have revealed no evidence of swelling, tenderness, or synovitis. (Tr. 203, 207, 216-231, 273-277, 320, 321, 324-326, 334-343). And, for the most part, plaintiff has maintained a full range of motion in all joints, in spite of being discharged from physical therapy due to noncompliance. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). (Tr. 202, 328). In fact, Dr. Sakr indicated that plaintiff exhibited only 8 out of the 18 possible fibromyalgia tender points. (Tr. 273-277). Currently, the American College of Rheumatology guidelines state that pain at 11 of the tender points may indicate fibromyalgia. There is no indication in the record that plaintiff has ever suffered from pain in 11 of the tender points. Therefore, there is a question concerning the severity of plaintiff's impairment.

There is also some question concerning plaintiff's diagnosis of arthritis/osteoarthritis. At least one doctor refused to write a letter stating that plaintiff suffered from osteoarthritis because he did not find that the objective medical evidence supported this diagnosis. (Tr. 184). *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). This certainly does not support plaintiff's contention that her condition is disabling.

16

Plaintiff also contends that bowel and bladder incontinence and migraine headaches render her disabled. However, we note that she takes no medication to prevent the onset of migraine headaches, has not required emergency treatment for them, and has not required regular treatment for headaches. Although she contends she has experienced some bowel/bladder accidents in the past, the record contains no evidence to document a physiological problem. In fact, plaintiff even testified that she had not discussed this problem with her doctors. (Tr. 377-378). *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). Had plaintiff's condition been as severe as alleged, we believe she would have sought more consistent treatment.

Records do indicate that plaintiff was suffering from depression, anxiety, and a personality disorder. For this, she was prescribed Effexor-XR, Lexapro, and Cymbalta. However, she has not sought outpatient mental health treatment from a mental health professional, and the record shows no inpatient mental health treatment. In fact, plaintiff was assessed with a GAF of 60-65, which is indicative of moderate to mild symptoms or some difficulty in social, occupational, or school functioning. Scores between 61 and 70 generally indicate that the individual is functioning "pretty well" and has some meaningful interpersonal relationships. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER IV-TR 34 (4th ed. 2000). As such, it is clear that plaintiff's mental impairments do not render her unable to perform all work-related activities.

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability. On her supplemental interview outline, plaintiff reported the ability to care for her

17

personal hygiene; prepare three meals per day to include sandwiches, frozen dinners, meats, and vegetables; count change; drive; watch TV; listen to the radio; go swimming during the summer when she feels like it; and read.  (Tr. 95-96).  On paperwork submitted by her attorney, plaintiff indicated that the cooks, cleans house, cares for two special needs children, and grooms herself daily; washes dishes, vacuums, mops, does laundry, handles finances, attends sports events, and exercises weekly; and, dusts, supervises yard work, fixes things, and shops for groceries monthly. (Tr. 173).  At one point, she was also reportedly attending college.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, these activities are somewhat inconsistent with an allegation of disability.

Plaintiff's husband did testify on her behalf, essentially corroborating her testimony regarding her subjective complaints.  (Tr. 386-388).  As noted by the ALJ, Mr. Pratt would benefit financially from plaintiff obtaining disability benefits.  Accordingly, the ALJ was within his authority in discrediting Mr. Pratt's testimony.  *See Owenbey v. Shalala*, 5 F.3d 342 (8th Cir. 1993).

Therefore, although it is clear that plaintiff suffers from some degree of impairment,  she has not established that she is unable to engage in any and all gainful activity.  *See Craig v.*

18

*Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability.  Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Next, we consider the ALJ's determination that plaintiff can perform a range of sedentary exertional work.  It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence."  *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace."  *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional.  *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

AO72A
(Rev. 8/82)

In the present case, the ALJ considered the medical assessment of a non-examining agency medical consultant, the assessment of a consultative orthopaedist, the assessment of a consultative psychologist, plaintiff's subjective complaints, and her medical records.  On June 25, 2004, Dr. Robert Redd, a non-examining physician, completed a physical RFC assessment. (Tr. 259-261).  After reviewing plaintiff's medical records, he concluded that plaintiff's lumbosacral strain, left forearm pain, and fibromyalgia were nonsevere.  (Tr. 259-261).

We note Dr. Sakr's RFC assessment as well.  He concluded plaintiff could occasionally lift up to 20 pounds and would experience significant limitations in reaching, handling, or fingering.  Specifically, he indicated that plaintiff could use her right hand 45% of the time and her left hand 35% of the time, use the fingers on both hands 50% of the time, and use both arms for overhead reaching 45% of the time.  Dr. Sakr also found that plaintiff's pain would often be sufficiently severe to interfere with her attention and concentration, and that her ability to deal with work stress would be moderately limited.  He  opined that she could walk ½ city blocks without rest or severe pain; sit, stand, and walk less than 2 hours during an 8-hour workday; need to include periods of walking during an 8-hour workday; could occasionally bend and twist at the waist; and, would likely miss work about once per month due to her impairments and treatment.  (Tr. 273-277).  It appears that the physical portion of the ALJ's RFC assessment tracks the language used by Dr. Sakr.  The only omissions are the fact that plaintiff would need a job that allows for sitting and standing at will and that she would need to lie down several times per day.  However, because there is no objective evidence to support the plaintiff's need to lie down, we find no error in the ALJ's exclusion of that portion of Dr. Sakr's opinion.  *See McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003) (ALJ properly limited the RFC

AO72A
(Rev. 8/82)

determination to only impairments and limitations he found credible based upon his evaluation of the entire record).  As previously stated, physical examination, x-rays, and MRI's have yielded very little documentation to support plaintiff's allegations of pain.  Likewise, the ALJ's omission of the sit/stand option is not of significance as it, too, is not supported by the overall record.

From a mental standpoint, the ALJ reviewed the assessments of both a psychologist and a neuropsychologist.  Dr. Smith assessed plaintiff with a GAF between 60 and 65.  As previously mentioned, a GAF of 60 is indicative of moderate limitations while a GAF between 61 and 70 is indicative of only mild  limitations.  When compared to his extremely restrictive mental RFC assessment, it is clear that Dr. Smith's opinion is somewhat inconsistent.  Therefore, we cannot say that the ALJ erred in dismissing Dr. Smith's conclusions.

We note Dr. Hudson's conclusions that plaintiff had a poor ability to deal with work stress, function independently, and demonstrate reliability.  He also noted that her ability to relate to co-workers, deal with the public, use judgment, and relate predictably in social situations was fair.  Further, he found her ability to understand, remember, and carry out complex job instructions was fair to poor, and her ability to behave in an emotionally stable manner was good to poor, depending on the day.  He determined that she had very good to good abilities in all other areas.  Dr. Hudson stated that plaintiff had a tendency to overestimate her ability and knowledge.  While she could function independently in a situation suitable for her level of training, she would tend not to ask for help.  (Tr. 286-287).  This is remarkably similar to the ALJ's determination that plaintiff had a good ability to follow work rules, interact with supervisors, understand, remember, and carry out detailed but not complex job instructions,

AO72A
(Rev. 8/82)

maintain personal appearance, and behave in an emotionally stable manner; a fair ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, and understand, remember, and carry out complex job instructions; and, an unlimited ability to understand, remember, and carry out simple job instructions. Therefore, we find substantial evidence to support the ALJ's RFC determination.

Contrary to the plaintiff's argument, we do not find that further development of the record regarding plaintiff's mental impairment was necessary. While we are cognizant of Dr. Smith's diagnosis of organic brain syndrome resulting from a head injury sustained during plaintiff's childhood, we note that the plaintiff has lived with the alleged residuals of this injury her entire life. She even worked as a cashier for a period of time after sustaining the injury. Thus, had the head injury had the impact on plaintiff alleged by Dr. Smith, we would expect to have seen medical records referring to this injury and documenting plaintiff's treatment for the residuals of this injury. No such records exist. Accordingly, we do not believe that further development of the record is warranted. *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (holding ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled).

We also find that substantial evidence supports the ALJ's finding that plaintiff can perform work as a surveillance system monitor, call out operator, and order clerk. The VE testified that a person of plaintiff's age, education, and employment background could perform work in the areas of surveillance monitoring and order clerk. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). We note that the VE

22

did not agree that plaintiff's education level supported a finding that she could work as a call out operator, even though the DOT suggested that plaintiff could perform this job.  However, even assuming that the ALJ was wrong in concluding that plaintiff could perform the call out operator position, remand is not necessary as the ALJ also concluded plaintiff could perform two other positions.  Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could still perform work that exists in significant numbers in the national economy.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this <u>19th</u> day of May 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE